We have three cases for argument today, and we are prepared to begin with the first one of Black v. Brice. We'll hear from appellant's counsel here. Good morning, your honors, and may it please the court. My name is Thomas Fox, and I represent the appellant, Carol Black, and administrator of Schletter, Inc., the debtor in the underlying Chapter 11 bankruptcy case. I would like to reserve two minutes for rebuttal. This appeal challenges the U.S. Bankruptcy Court for the Western District of North Carolina's grant of summary judgment in favor of Dennis Brice, the former chief executive officer of Schletter. The district court affirmed the grant of summary judgment. Both courts erred, and we respectfully ask this court to reverse and remand for trial. Briefly, this case involves the untimely collapse, bankruptcy, and liquidation of Schletter, a North Carolina-based corporation that designed and manufactured solar panel mounting systems for commercial applications. It was, but it's also a corporation that's totally, almost totally owned by a German parent corporation. Only 5% of it was there, and I understand there's a, I don't know if it's unique to German law, that 5% going to treasure? Is that done in the United States, too? Your Honor, my understanding is that that is somewhat common practice in Germany to have 5% of shares reserved. Now, it is our understanding that at some point in time, there was an individual named Martin Kausner that held that 5%. I don't know about him. That's not important. He's gone out of the picture, but I'm just, you know, when you say a North Carolina corporation is really German in the sense that 95% of it is German, and that 5% is in the treasury there. I don't know what they own of themselves, but all right, proceed. Judge Floyd had a question. I had a question. Don't you think it's relevant for us to identify right out of the chute when Schletter became insolvent, and can you tell us that date? Yes, I can, Your Honor. And do the two parties agree on that date? Well, Your Honor, I guess we'll have to leave it to Mr. Sims to tell us whether his client agrees, but we have an insolvency analysis that was prepared by BDO, which was the official committee of unsecured creditors financial advisor appointed in the Schletter case. They prepared a detailed insolvency analysis, and they determined that as of June 30, 2017, Schletter was insolvent on several bases, including a balance sheet analysis and an ability to pay debts as they come due analysis. And they assert further in their report that Schletter continued to be insolvent after that date and consistently throughout the pre-bankruptcy and then into bankruptcy. And my follow-up to that is, who bears the burden of proving the timing of his insolvency? I would acknowledge that it would be our burden to prove that. And I would note, Your Honor, that our evidence of insolvency is uncontroverted by Mr. Bryce. Importance of that issue is what? It's very important. Why? It's important because it bears directly on whether Mr. Bryce owed fiduciary duties to Schletter. That being if it was because it's a subsidiary, with the law basically saying his duty would go to the parent corporation, the exception being if it's a subsidiary and it's insolvent, then you have a different picture than if it's solvent. That is absolutely correct, Your Honor. You're saying it was insolvent while he was still CEO. That is correct. Critical point. I agree with that, Your Honor. But, Counsel, what is the evidence of that? The BDO time period begins after Mr. Bryce was out of the picture. The BDO analysis started before the date on which they assert that Schletter became insolvent. So what you see here is that in periods preceding that date, June 30, 2017, occurred shortly after the GMAX product launch, which is the event that we assert really drove this company into bankruptcy. BDO acknowledged that in 2016, the year prior to when this occurred, Schletter had generated positive EBITDA. I think about $1.8 million. In 2017, when the GMAX launch occurred, the EBITDA dropped to significantly negative levels. But did BDO report? There's no expert opinion that the company was insolvent at any time that Bryce was the CEO. Is that correct? BDO's assertion is they did not opine that the company had become insolvent at a date prior to June 30, 2017. If we find Schletter to be a wholly owned subsidiary of Schletter Germany, do you agree that we would apply the business judgment rule in our standard of review? Well, Your Honor, I'm going to get into a Karamark discussion in a few minutes, and I think we would contend that we would not apply the business judgment rule in light of that. But I think there was a threshold issue that we really needed to talk about, and that is whether— But did you hear the premise he said? If we determine that it is wholly owned, then what's the answer? If it is determined that it's wholly owned, I think there's a two-step analysis we have to go through here. First off, did Bryce even owe a fiduciary duty to Schletter and its creditors? And then secondarily, what is the standard upon which we're going to review Mr. Bryce's conduct? So to turn to that first issue, even if we're going to stipulate that Schletter was a wholly owned subsidiary of Schletter Germany, at some point in time, Schletter became insolvent. When Schletter became insolvent or even entered the zone of insolvency, duties expand. Duties expand from the parent company to the enterprise and its creditors. So we have that. Then we have the secondary step of whether Mr. Bryce can be held responsible for his conduct or his omissions at relevant periods of time. And I think it might be worth us jumping over to that discussion right now. Counsel, if I could, though, you refer to the zone of insolvency. As I read the Gibala case, either a company is insolvent or it's not. As I read that case, the Delaware Supreme Court has put aside this concept of there being a gray area. What do you make of that? Your Honor, if that is what Gibala stated, I'm not going to try to create new law here. We do have a date according to the BDO analysis as to when this company was insolvent. And if that is the date we have to work with, that is the date we have to work with. Obviously, actions that occurred prior to that date are well- Explain what you're saying. In light of the question, you said if that is the law. I mean, take it that it is the law as the judge has stated it. What's your answer? My answer would be that the duty wouldn't shift until there is an insolvency. Well, I have one more baseline question while you're thinking. I had about five questions I want to get in my head. My last one is, did Shetler, and it may be better addressed to the other party, but has Shetler identified any other conflicts of interest that would cause us to use a heightened standard of review? So, as it relates to Bryce, I think the only conflict of interest that would be easily identifiable, since Bryce did not himself have any ownership interest in either Schlatter or its parent company, would be the fact that he was also the CEO of Schlatter Canada. Now, the Schlatter Canada issues, I think, are probably, from an economic perspective, fairly modest in the grand scheme of things, but there were allegations in our complaint that Mr. Bryce caused certain products to be sold by Schlatter U.S. to Schlatter Canada at cost and not at profit. And that resulted in a significant receivable being accrued at the U.S. end that obviously was never collected. That was only, I think, several hundred thousand dollars, though, out of the approximately 12-plus million dollars of losses that occurred as a result of various forms of conduct, including the relinquishment of the intellectual property related to the GMAC system, as well as the direct losses that were incurred as a result of the rushed launch of the GMAC system. Your Honors, I'd like to now turn to the appellant's Karamark claim, as that is the second primary issue that was addressed by both the bankruptcy court and the district court in their respective opinions. So with the two claims, you have a duty of loyalty and a duty of care, and the Karamark claim falls under the duty of loyalty? That is correct, Your Honor. Okay. Go ahead. Okay. Under Karamark and its progeny, there are two alternative bases for oversight liability, which under Delaware law sound in the duty of loyalty. First, that the fiduciary utterly failed to implement any reporting or information systems or controls, which are known as information systems claims. And second, that having implemented such a system, the fiduciary consciously failed to monitor or oversee its operations, thus disabling it from being informed of risks or problems requiring its attention, which are known as red flags claims. I think the Karamark claims are probably the most difficult thing to prove. Numerous courts that have addressed Karamark claims on a red flags theory have indeed stated that. They have asserted that these are difficult claims to prove up under Delaware law when contrasted with claims that assert that a board of directors failed to implement controls that were related directly to violations of law. So tell me why it is this case is going to meet that very difficult burden of satisfying its Karamark claim. I think there's a lot of distinctions to be drawn here, Your Honors, from the various cases that have been cited in the appellee's brief, and frankly in our brief, to the situation we are dealing with. I think there's a few important things to note. First off, there is very little jurisprudence out there concerning officers' liability for under Karamark. Most of the cases deal with director liability under Karamark, and aside from several courts stating that a claim can be sustained under Karamark against an officer, I'm not aware of any reported decisions that directly deal with that issue. Moreover, we have a situation here where most of the reported decisions— Well, it's a tough thing to prove. You've got someone in the instance of this CEO. You had a product there. I had to look that up because I hadn't seen one of these solar panel type things up there to kind of figure it out. I think that's okay because it's public record. But he's trying to improve the company. I mean, he goes to get approval from the parent company to do it. Then he undertakes to get contracts set, and he's working hard to try to make this thing work. He has some deadlines and some serious problems along the way in trying to get it done, and, you know, ultimately it just fails, I guess. But, you know, maybe the reason you don't see a lot of cases on it because when you have an official who's doing that and working hard, it's more of a poor business decision than it is someone who is doing something in a way that is just wrongdoing for a corporation, to meet the Karamark standard. So how is that different here for Mr. Bryce? I think it's different here. Let's kind of take it piece by piece here. As an initial matter, I don't think there would be any criticism levied upon Mr. Bryce or any of the other leadership at Schlatter for wanting to develop a new and improved product and bring it to market and hopefully generate profit from the sales of that product. Who developed the product? There was some question about that, too. Whether the product was developed either by the U.S. company or the German, but you were paying fees to the German. That is correct. Let me address that for a moment, Your Honor. The district court came to the conclusion that the GMAC system was nothing more than an improvement on the previous FS-UNO system, a contention that we disagree with and a contention, frankly, that we think would be worthy of being more further developed at a trial. There were numerous different new components to the GMAC system that were not shared with FS-UNO, different mounting, multiple different parts. Part of that is kind of the reason why there were so many issues with GMACs, because there were a whole host of new parts, new and unique parts, that were a part of that system that were wholly developed by Schlatter U.S. This was the first time that Schlatter U.S. had actually developed its own system as opposed to simply manufacturing and selling a system developed by the German parent company. So starting with the premise that there is certainly nothing inherently wrong with wanting to develop and go to market with a new product, we have to look at what happened here with the development of this particular product and its highly premature launch. We had numerous new components that were still in the process of being developed when there was a rush to sign contracts containing onerous liquidated damages provisions. We had a company that did not have the capability to manufacture enough components to meet the demand of its customers, who had ordered $40 million worth of product. And I should note that the revenues of Schlatter in 2017 were about $80 million. So this was a very, very significant component of the company's revenue, approximately one-half of that revenue, and was expected to become a larger percentage of the revenue in future years had the system worked out, which it did not. So we had the push and pull between numerous entered-into contracts that had very onerous liquidated damages provisions, coupled with the fact that we had a system that wasn't ready. The parts hadn't been fully developed, no field testing had occurred, and yet it was decided that we're going to go launch this product. It wasn't ready. Mr. Fuchs, assume that the business judgment rule applies to those decisions. What is your best argument that those decisions constitute a violation of the business judgment rule, or that notwithstanding the business judgment rule, there is a caremark violation? Certainly, certainly. So we would contend, Your Honor, that a reasonably prudent person in Mr. Bryce's position would not have allowed this product to go to market given the lack of the field testing, given the lack of the fact that the products were not up to specifications, were not going to meet the customer's contractual requirements, and were almost certainly going to cause breaches of those contracts, which, in fact, did happen. So it was the entry into the contracts that you contend was a violation? Well, I'm sorry, Your Honor, I didn't mean to interrupt you. I would contend that the entry of the contracts was premature when you don't even have a product that's ready to launch. Had the company simply waited, and this was something that was being discussed internally, we had people that had expertise in the development of products like this saying this is not ready. And I think if there had just been a little more time and a little more care taken to fully develop out the products, do a field test, install it at a location so that it can confirm that the products actually worked as they were supposed to work, and then enter into the contracts, you would have not, this company wouldn't have gone into bankruptcy. This company would not have become solid. Product is no good if you don't have contracts. I mean, you can say we can do it, and contracts are time-sensitive in many instances. I mean, it's kind of difficult to second-guess CEOs of companies as to why they do stuff. And, you know, if it works, everybody's happy. But where, in anything you've said, following up on Judge Everson's question, where is the bad faith on this part? I mean, yeah, things didn't go well. It was delayed. It shouldn't have maybe gotten these contracts so quickly. Where is bad faith in it that McDonald's would require? Your Honor, we are not contending that Mr. Brice had ill intent in what he was doing. I have no doubt that Mr. Brice sincerely wanted the company to succeed. What about my term, bad faith? Well, bad faith. Did he have bad faith in what he was doing? A conscious disregard of the red flags is tantamount to bad faith under McDonald's, and that is what we are contending out there. So you are saying he was, it was bad faith. We have to say it was bad faith because we can't sustain a claim otherwise. So because of the conscious disregard of the red flags that had been identified by the experienced professionals at Schlatter who said this product is not ready for launch, it is not ready for installation at customer sites, yet we went ahead and did it anyway, that in our view is tantamount to bad faith and therefore sustains a Karamark claim. I know I'm getting a little short on time here, so I'm going to have to skip ahead a little bit. Your Honors, the appellee asserts that essentially we cannot assert a Karamark claim and cites several cases in support of that proposition, Citigroup, Goldman Sachs, Walton. And we assert, Your Honors, that our situation is distinguishable for several reasons. First off, we certainly acknowledge the Citigroup decision really came down to macroeconomic factors that were outside of the control of the Board of Directors. Here, that is not the case. We have an individual, Bryce, who was the CEO of this company. This company had a very limited scope in terms of what it did. Bryce was very well aware of what was going on. He was meeting with the Schleder management on a weekly, daily basis, recognized that there were specific micro-issues with this particular product, and yet allowed it to go to market. If we look at some of the other cases, like Goldman Sachs, where the conduct of the Board of Directors was criticized in terms of providing certain compensation structures to Goldman professionals, I think this is a completely different situation as well. I think one thing that really distinguishes our situation, oh, and it looks like I'm out of time. May I finish this up? You are, indeed. We'll get back. You've got two more minutes after this is over. Let's hear from Mr. Sims on this case. Thank you, Your Honor. Thank you for that. Good morning, Your Honors. It's Charles Sims on behalf of Mr. Bryce. May it please the Court, I think as the Court has seen in the argument, in a nutshell, what the administrator seeks in this appeal is to have this Court impose fiduciary liability on a corporate officer because, with the aid of hindsight, the administrator contends that the corporate officer's pursuit of a Board-approved business strategy to develop and market a new strategy, a new racking system to GMAX, failed. Address the question Judge Floyd posed in terms of solvency. Okay. First of all, I think it's very important to stress this point right now, Your Honor. So much of what was being argued to this Court by appellant's counsel is not a factual record that's before the Court. So there's all this reference to the BDO report. The only reference to the BDO report is in the complaint. Are you saying we can't consider it? Yes, Your Honor, because it's not evidence. We came in summary judgment of Rule 56 and presented evidence to establish our foundational basis that the plaintiff couldn't prove their case. They were under the obligation to come forward with evidence, admissible evidence, that would raise a genuine issue of material fact. They did not present the BDO report as evidence before the district court. And this court, as well as the district court, are tied to the record that's presented to the bankruptcy court when it considers summary judgment. The BDO report is not evidence that was presented to the court. But put that aside, even if the court wanted to look at the BDO report, what counsels correctly stated is that BDO found only that there was insolvency on June 30th. Mr. Bryce's employment was terminated on June 27th. And as Judge Abelson stated in the Gilawer case, the Delaware Supreme Court has made absolutely clear that the zone of insolvency is irrelevant. I actually will cite to the court what the Delaware Supreme Court said. It said, when a solvent corporation is navigating in the zone of insolvency, the focus of Delaware directors does not change. Directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interest of the corporation for the benefit of its shareholder owners. And as we cited the Abelson case in our brief, the Delaware Supreme Court has said in the context of this situation, where we have a wholly owned subsidiary, the duty of Mr. Bryce, the officers, and the directors of that company is to further the interest of its parent company. So you think this case is real simple, don't you? Because what you just said, if it's not solvent, insolvent, during the time that he's CEO, which you say even receiving the BDO report, he was gone three days before that came out, and it's wholly owned with the German company over there, with 5 percent if we consider that to be wholly owned, that's the end of this case. That's what, a one-paragraph opinion? It is, Your Honor. Well, and you have to deal with the Caremark claim, but it does. It ends the case on this issue. Because this is a business judgment rule. I mean, the evidence was overwhelming that we presented to the bankruptcy court. This was a situation, and I'll say this, the bankruptcy court noted during the summary judgment argument is courts are not in a position to second-guess business executives on these types of decisions. Because the record evidence established that prior to kind of going down this road that Mr. Bryce did with his strategy on the GMAX, the company was suffering severe economic distress. Its product was no longer viable in the market, and there were competitive issues coming with the Chinese, and flux into the solar panel into the marketplace. And so he needed to develop a new product. And here's what Mr. Bryce did. Mr. Bryce evaluated that opportunity, made a proposal to the board. And this is the other key thing. As an officer, Delaware law makes clear, he's subject to the direction of the board. He has an obligation to comply with the board directors. And not only was that clear by common law, but it's also clear in the bylaws mandated that, that the German company maintained control over all the major business decisions of the subsidiary, and it was also in his limitation of authority agreement that he signed as the CEO. So he came to the board with a proposal. This is a strategy I'm proposing to try to bring this company back to profitability. The German board approved that strategy, directed him to proceed with it, and then throughout that process, he kept the board informed. There was actually a member of the board that was an engineer that he was instructed to have involved in it. The testimony, the evidence was this was a hands-on employee. He was intimately involved in what was going on. So when you get a case like this, a summary judgment case, Mr. Falks is not trying to win the case today. He just wants to get back beyond summary judgment, which means there's an issue of fact in this case. So he sprouts out a number of facts that really are concerning. That is, you know, you're setting up these contracts. You're not even ready for them. People are telling you not to set up contracts. You're rushing them through. You're not really prepared in doing it. Is that sufficient to create an issue of fact? No, Your Honor, because, again, courts aren't in a position, and that's why you have the business judgment rule. Courts aren't in a position to reevaluate risk. All of this is just merely risk. This is a situation where you've got a record evidence, undisputed evidence, is that Shetler had coordinated with one of its major customers to make this design development, that there were these opportunities to get these Florida contracts to go deliver that product. And so, yes, you're taking a business risk because they want this product, the GMAX. They don't want the FSU note. They don't want the other one. They're not going to buy it. So your opportunity here is to develop this and to get it done and deliver it. Those are business risks. And in order to get past the business judgment rule, you have to say that this is basically a gross negligence standard. Or that there's a conflict of interest. Just to make sure that we close the loop, Mr. Fox referred to the Canada arrangement. So why does that not trigger at that? It doesn't create a conflict. First of all, the Canada issue has nothing to do with the development of GMAX in these contracts. There's some allegations related to some transfers to Germany, to Shetler Canada. The problem is that Shetler Canada is wholly owned by Shetler Germany as is Shetler. And he's under the direction of the board to do these actions. So he's just merely following the directions of his parent in terms of how they're acquiring property or moving assets to Shetler Canada. That doesn't create a conflict. He doesn't benefit from that at all. And going back to the standard here for the business judgment rule, which is basically outcome determinative, right? Potentially, mostly. It has to be rationally inconceivable, right? That nobody would have taken this on. Nobody would have tried this. And the evidence on this is to the contrary. He had board approval to proceed with this. Everybody, this was a strategy they were all trying to pursue. So that's why the court was correct, both the district court and the bankruptcy court, in looking at the business judgment rule and saying they failed to overcome. Well, having said all that, is it your position, I guess, that solvency doesn't play a role in this case? It doesn't play a role because solvency was after the fact. But even if you accept something that's not in the record, which is the complaint, the BDO statement in the complaint, which is not evidence, right? That date is June 30th. It's counsel conceded. It's after Mr. Bryce had left the company. So my second question is, do you believe we have to determine that Shetler is a wholly owned German company or not? I don't think you do in that sense. Now, I think it helps us in that reality. Well, if we don't, what rule do we apply? Because if it is wholly owned, it's the business judgment rule. If it's not, what is it? No, it is the business judgment rule. If it's wholly owned, it doesn't matter. In either scenario? It's the business judgment rule. What it does is it insulates Mr. Bryce. If it's wholly owned, it insulates Mr. Bryce from following the directions of its parent, advancing. So, for example, the allegation that he was paying the license fees, Shetler was paying license fees to the parent. You can analyze that under the principle it's wholly owned. So if the Shetler Germany wants those fees, it's entitled to get those fees and there's no breach of a duty. If it's not wholly owned, and I don't know how it could not be wholly owned because there's no other entity other than Shetler Germany that owns its stock. The 5% sitting in the treasury is owned by no one. So there's only one owner, so totally owned. But that, even if you say, well, maybe the treasurer owns it, which is inconceivable, but it doesn't get rid of the business judgment rule. He's applying the business, doing what he thinks is in the best interest of the company and paying these fees, maintaining the contractual relationship as they're developing this product. So I think the business judgment rule would apply. Now, on the Caremark, I'm sorry, Mr. Sims, before you go back to the Caremark claim, on this insolvency point, the BDO report lets us, again, assume that we consider it. It's in the district court record and begins with the date that postdates Mr. Bryce's departure. One of the appellant's arguments is, well, yes, that's what the BDO date was. And, yes, let's assume there's not a zone of insolvency layer of the analysis, but one of their points is a reasonable jury could infer from the BDO report that actually the company was insolvent sometime before that date. Why should we not accept that argument? Because they needed, at the summary judgment, they needed to put evidence in to establish that date. Because, and it goes to the issue, right? If it's three days before he's terminated, then you would look at those three days to see, well, is there an issue in terms of what he was doing in those three days, right? If you go out three weeks, there's a, okay, so maybe you evaluate those three weeks. He needed to establish, the administrator had a duty at the summary judgment stage to come in and establish the point of insolvency. But it's not like a time of death when someone, you have a date, and it happens, and all of a sudden you said he died on this date. When you made a determination of insolvency three days after, I mean, common sense tells you that company had something going on before then in order to get there. You build upon it to come to that. And the question that Judge Abramson, forgive me for the pronunciation, it goes to that, and that is, why couldn't a jury make a determination that, you know, yeah, there is this exception here, but, you know, given the nature of the report, and when we go into it, maybe through discovery and all of it, and we decide, okay, this was already happening before then. Well, a jury can't speculate. That's, they can't speculate. There's no reasonable inference of when. I mean, the point of insolvency is only the point that the creditors now, that the interest of the creditors is part of the consideration, okay? In the real world, most executives and board don't know when they're crossing into that zone of insolvency. A lot of times, that's a litigated after-the-fact situation to come back in and say, wait a minute. Here was the point of insolvency, but here's the key thing. It's always a date. It's not a ephemeral, you know, oh, we're looking at this three-month period. And this is what BDO did. They picked a date. And that is important under Delaware law because Delaware says until the point of insolvency, not the zone of insolvency, but the point of insolvency, the officers and directors of a fiduciary duty to the shareholder only, and in this case, the wholly-owned shareholders. That's who they owe a duty to. And, in fact, early in the case, I believe the administrator, maybe it was in the complaint, reserved the right to argue or come forward with evidence of an earlier insolvency date, but never did. Never did. That's correct. So let me go back and just make sure I'm clear. Insolvency doesn't matter. And I think we can agree that allegations in the complaint don't rise to the level of evidence for a Rule 56 motion. What other evidence are you aware of in the record that would support their date claim, insolvency date claim? I am unaware of any evidence in the record that would support a date of insolvency, Your Honor. Earlier than the June date. If we consider the BDO report. Exactly, Your Honor. Was it a verified complaint? No, Your Honor. All right. Do you have anything further? Do you want me to address the care mark? I will just say this. Thank you very much. Okay, thank you. Mr. Fox, you have reserved yourself an abundance of time, two minutes. Thank you, Your Honor. I think I'd like to just address one other issue here. And that is we had some discussion regarding the appropriate standard to be applied here. And I think it's important to remember here that it wasn't just that Mr. Bryce was subject to the direction of the Board of Directors. Mr. Bryce has actually alleged that he was basically under the thumb of Schleder Germany and didn't really have the ability to act independently at all. And that actually calls into question what the appropriate standard is here for review. And I think it's important to mention a couple of cases here. First off, the In re MFW shareholders litigation in which the court applied the entire fairness standard where, quote, the fiduciary was so – I'm sorry. The fiduciary was, quote, beholden to the controlling party or so under the controller's influence that the fiduciary's discretion would be sterilized. Also, the Orman v. Cullinan case at 794A2nd 5 at page 22, which is a Delaware Chancery case from 2002, in which the court stated that if the fiduciary, quote, lacked the independence to consider whether the transaction was in the best interest of the company and all of its shareholders. Well, that's nice. But what's your evidence of that in the record at the time of summary judgment? Our evidence, Your Honor, is Bryce's admission to that effect. Bryce has acknowledged that. In this record, there's an admission from Mr. Bryce that he was under the thumb of his board and he had no discretion. I don't believe he used the words under the thumb, but I believe he actually – I believe that's actually been stated. Well, what did he say? I don't have the – Well, you're asking me – you're asking me to accept that there's evidence that this guy couldn't perform his duties as the CEO of that company. This is what has been alleged by Bryce in his briefing in the bankruptcy court, the district court, and I believe in this court as well, Your Honor. Could I – could I ask one? Of course you may. You may ask as many questions as you like. Thank you. I'm trying to understand this under-the-thumb theory. Schlatter U.S., let's assume, is a wholly owned subsidiary of Schlatter Germany. As I read the Delaware cases, that meant that the CEO of the sub owed fiduciary duties to the parent. That's awfully close to taking the direction from and working for the benefit of the parent. So why does it breach the duties that Bryce had to take the direction from and do what the parent wanted him to do? Well, Your Honor, first off, notwithstanding the fact that Bryce owed fiduciary duties to the parent, Delaware recognizes the corporate separateness between a parent and a subsidiary. And so Bryce still had obligations to the subsidiary, notwithstanding the fact that it was a wholly owned subsidiary and notwithstanding the fact that he had, pursuant to his – to the corporate bylaws, he had certain obligations to take direction from the board. I think the point is this goes a little further than taking direction from the board. Bryce has actually said it's more than that. It was basically, I read it as not having the ability to take any sort of independent actions that might even deviate from the direction given by the board, even if he thought that deviation would be in the best interest of the subsidiary. So that's where I'm trying to draw the distinction here. There's taking direction on one hand, and then there is absolute lack of any discretion on the other hand. But do you agree that under Delaware law, the parent can direct the CEO of a subsidiary to close it down? If it was determined that that would be in the best interest of the stakeholders, I suppose it could. Okay. Thank you, Your Honors. All right. Thank you very much, both, for your arguments. As is our tradition, we will come down to Greek Council. Our good colleague, Judge Floyd, has chosen to remain here, but his good feelings will be with you as we shake your hands down here.
judges: James Andrew Wynn, Henry F. Floyd, Adam B. Abelson